IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SUSAN M. DEJONG,

                   Petitioner,

      vs.

STATE OF NEBRASKA, WARDEN
DENIS SKROBECKI, DIRECTOR
SCOTT R. FRAKES, NEBRASKA
CORRECTIONAL CENTER FOR
WOMEN,

              Respondents.

**4:16CV3020**

**MEMORANDUM
AND ORDER**[*]

This matter is before the court on Petitioner Susan M. DeJong's ("DeJong") Petition for Writ of Habeas Corpus. (Filing No. 1.) With the court's permission, DeJong subsequently filed an amended petition. (Filing No. 11; Filing No. 13.) For the reasons that follow, the court will dismiss DeJong's habeas petition and amended petition with prejudice.

Liberally construed, DeJong argues in her habeas petition and amended petition that she is entitled to a writ of habeas corpus based on the following claims:

---

[*] This opinion contains hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

Claim One:          Her conviction was obtained by a violation of the privilege against self-incrimination.

Claim Two:          She was denied access to an attorney during interrogation.

Claim Three:        She was unlawfully detained by investigators.

Claim Four:         Her conviction was obtained by use of a coerced confession.

Claim Five:         She was convicted based on insufficient evidence.

Claim Six:          She is innocent.

Claim Seven:        She was denied effective assistance of counsel when counsel (a) failed to make various arguments at trial, (b) did not allow her to participate during trial and in jury selection, and (c) failed to assert the claims in her habeas petition on direct appeal.

(*See* Filing No. 11; Filing No. 13.)

# I.  BACKGROUND

## A.    Conviction and Sentence

The court states the facts as they were recited by the Nebraska Supreme Court in *State v. DeJong*, 845 N.W.2d 858, 863–71 (Neb. 2014) (affirming DeJong's convictions and sentences on direct appeal). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006).

## BACKGROUND

On March 11, 2011, Susan called the 911 emergency dispatch service at approximately 4 p.m. Susan told the operator that her husband, Tom, was not breathing and was cold to the touch. Susan stated that Tom had gone to South Dakota to be with his "whore" and came home "all ... beat up." The operator had Susan perform cardiopulmonary resuscitation on Tom until the emergency units arrived.

When emergency personnel arrived at the DeJong home, Susan was hysterical and she repeatedly stated that the "whore" had done this to Tom. Emergency personnel immediately began resuscitation efforts. Tom was not breathing, and there was no heartbeat. Dried blood was around his nostrils and the top of his mouth. His hands, arms, feet, legs, torso, and head were visibly scratched, cut, and deeply bruised. Emergency personnel were able to help Tom regain a heartbeat.

Tom was taken to the Jefferson Community Health Center and was later transported by ambulance to Bryan Health, west campus trauma center, in Lincoln,

3

Nebraska (Bryan hospital). Laboratory reports and blood tests indicated a threat of imminent heart and renal failure. A chest x ray indicated multiple rib-sided fractures and a partially collapsed lung. A CAT scan revealed the following injuries: a swollen brain; a tremendous amount of fractures within the chest cavity, including the spine, the ribs, and the scapula; a comminuted fracture of the nose; and a possible fracture of the hyoid bone in the neck.

The treating physicians concluded that Tom would not be able to recover from the injuries. The physicians asked Susan for permission to remove Tom from life support, and she granted the request. Tom passed away shortly thereafter.

## SUSAN'S STATEMENTS AT HOSPITALS

At the Jefferson Community Health Center, Rebecca McClure, a nurse, stayed with Susan while waiting for Tom's prognosis. The two of them waited in a small quiet room located outside of the emergency room.

Susan told McClure that she had not seen Tom since Wednesday and that he came home that Friday morning. She stated that Tom was "stumbling around in the house" and that the noise woke her up. Tom had been beaten, was cold, and quickly became unresponsive. Susan told McClure that Tom had spent the past days visiting the "whore" in South Dakota. According to Susan, the "whore" would beat Tom with tie-down straps from Tom's semi-truck. Susan also stated that the "whore" and Tom were trying to kill her by giving her a sexually transmitted disease (STD). McClure personally drove Susan home after Tom was transported to Lincoln, and Susan then drove herself to Bryan hospital in Lincoln.

Investigator Wendy Ground from the Lincoln Police Department arrived at Bryan hospital at approximately 10:20 p.m. Ground questioned Susan about Tom's injuries. Susan told Ground that Tom had returned home that morning. He looked pale, and he had stated that he did not feel well. Susan told Ground that Tom was apologetic and that he had told her he had made a mistake. According to Susan, Tom said his alleged mistress did not love him and that the mistress went "psycho" and wanted to kill him. Susan told Ground that the mistress had previously tried to kill Susan by cutting her vehicle's brake lines.

Ground asked Susan about Tom's medical history. Susan stated that Tom had been feeling weak and clumsy for the past 2 ½ years. Susan stated that he was diagnosed with an STD 1 ½ years ago. Susan also explained that the current cut on Tom's lip was caused by a pipe when Tom was working with a cow.

After Tom had been declared dead, Ground asked Susan if she was willing to go to the police headquarters for an interview. Susan agreed.

INTERROGATION OF SUSAN AT POLICE HEADQUARTERS

After arriving at the police headquarters at approximately 1 a.m., Ground placed Susan in an interview room. Ground left the room, and Susan began working on her written statement. Susan was left alone in the interview room from 1:12 to 3:04 a.m.

At approximately 3:04 a.m., Ground reentered the interview room. At 3:08 a.m., Ground read Susan her *Miranda* rights and Susan told Ground that she understood her rights. Susan proceeded to sign the *Miranda* waiver.

Ground began the interrogation by asking general questions about Tom's injuries and his whereabouts for the week. Susan repeated the facts as she had stated at Bryan hospital.

Susan stated Tom went to Seward, Nebraska, on Monday, March 7, 2011, for a job application and from there he went directly to South Dakota. Susan told Ground that she had talked to him on her cell phone on Monday, March 7, for approximately 44 minutes. According to Susan, Tom indicated that he wanted to be with "that thing." On March 8, Susan and Tom talked for 5 minutes, and Susan told Ground that she likely screamed at him because she was not happy.

At approximately 3:22 a.m., Susan told Ground that she was exhausted. But she continued to talk. Susan explained that the next time she heard from Tom was on Friday morning. She again repeated the same story of what had occurred that day. At approximately 3:34 a.m., Susan stated that she needed some sleep because she was exhausted.

The questioning continued, and Susan stated that she had confronted Tom when he came home on Friday morning because she was angry. Susan told Ground that she cannot say for sure that Tom drove home and that she does not know how he could have driven in his condition.

At approximately 3:41 a.m., Investigator Robert Farber entered the room and silently sat at the table. At 3:42 a.m., Susan began crying, and at 3:43 a.m., she stated, "I'm tired. I wanna go to bed, please. I'm done, I wanna go to sleep. I'm tired." Farber immediately interrupted her and introduced himself. Farber then told Susan that he had "a couple questions."

6

Farber began questioning. He asked Susan when Tom and she were married and whether they have common children. Farber questioned Susan about her relationship with Tom and about Tom's alleged relationship with his mistress. The questions became more directed and intense as Farber continued the interrogation.

In response to the questioning, Susan stated that everybody called Tom a "wheeney" and that he took the beatings from his alleged mistress. Susan also stated that Tom had slapped her in Minnesota. Susan explained that she was arrested for that incident because she decided to not tell the police that Tom had slapped her.

At approximately 4 a.m., Susan again stated, "I'm getting tired, I'm done, I'm tired." Farber interjected again before Susan completed the statement. Farber asked Susan if she had anything to do with the injuries. Susan answered no; Farber continued to ask questions, and Susan continued to answer. For the next 18 minutes, the questions from Farber became more pointed and directed.

At 4:18 a.m., Susan exclaimed, "I want a lawyer, please. I'm tired of this." "I will talk [to] them and they, I want some sleep, please." "I didn't, I will, I just wanted to live and I loved him so much, and I just wanted to live and he wanted a divorce, and I just wanted to live with him.... I loved him." Farber said "okay" and left the room almost immediately. Ground followed.

Susan laid her head down at the table for approximately 30 seconds, stood, and grabbed her keys to leave. Susan opened the door to the interview room and asked to have a cigarette. Ground told her to take a seat. Susan turned around and mumbled, "So sorry. I'm sorry." Ground apparently paused to hear what Susan said

and then reentered. Ground silently took a seat at the table in the same spot she sat during the entire interrogation.

Susan talked uninterrupted for nearly 8 minutes with a slow delivery, while Ground sat and listened. Susan stated:

> So sorry. I'm sorry. (inaudible) beat by that whore. He used to come home, bruises, bloody nose, black eyes. He's got scars on his back that are not from me. He's got marks on him that are not from me. He'd come home and, well, he'd tell his boss (inaudible) on the trip. He'd tell me he did it on the truck going to (inaudible). Then he'd turn around, go to Sioux Falls and that Gloria. Oren called me today and asked if I'd seen your face. It's all bruised up. I told him that fuckin' cunt you're married to did it. (inaudible) I didn't ever touch him. Didn't ever touch him. When I slapped him in Fairbury, not Fairbury, in (inaudible), what the name of that town? I can't think of it, Burger King, God. The car pulls in there, parked, to get a burger but on the way in is when he finally admitted he'd been sleeping with that thing. Finally admitted it. He got our money, went into Burger King. I got out of the truck and proceeded to walk across the highway to the other little truck stop across the road and he followed me over there. Came up to me, grabbed one of the dogs and I picked my leg up. Leave it alone. And then I proceeded, I walked, was walking, trying to call my son to come get me but he wouldn't answer his stupid phone. Standing there at the back, I'm like I'm going home. I'm going home. Well, fine, I'll take you home. I don't know. I'm going home. That's when he shoved me into the wall and cracked me in the jaw. And I slapped him. Some kid walked out of Burger King. So I'm yowling so he called the cops. Next thing I know they're showing up. He said I'll take you home, I'll take you home. Fine, I'll take you home. Fine, I'll take you home. Then we got in the truck. Next thing I know there's the cops. Everybody thinks Tom is such an innocent man. He used to be. He used to be the most loving, gentle, sweet man you could meet. Till he met that (inaudible). Then they started molesting children. I still

8

say I think he was on drugs. Cuz you don't drive 14, 16 hours with nothing. My Blazer for one hasn't ever had a problem with the brakes. I hit a deer. Well, come to find out my front brakes are disconnected. Huh. Excuse me. I don't know. I just know that (inaudible) no more getting shoved. (inaudible) I didn't poison him. He is what he is from what he plays with. (inaudible) He told me he was going to kill me. (inaudible) kill me. (inaudible) Am I under arrest?

Ground told Susan that the decision for arrest was up to the police department in Fairbury, Nebraska. Ground answered some questions from Susan, but did not ask Susan any questions.

Susan continued:

Self-defense, because I don't bruise and he does. That's pretty much the way that goes. (inaudible) she did (inaudible) to him. For what she did to him. He wasn't the man I married. What I told you about it is all true. It does deal drugs, (inaudible) drugs, go psycho. And it went psycho on him more than once. Does molest children. Little boy's name's Chris.... I have to be arraigned within 24 hours. I know that, why not. Just like the deal in Minnesota. And he'll walk away scott free. And there's a lot of the injuries he had [that were] not from me. The worse one he get that I can remember is falling off the ladder. That one scared me. Why didn't I just leave. Why didn't I just run. Because he always showed up. He always showed up. (inaudible) I need some sleep. (inaudible) so tired. I just, I just need somebody to talk for me right now, I'm so tired. I'm too tried. I haven't (inaudible) for two days. Could you? I want a cigarette.

Ground responded: "Okay, just be patient with us." Susan continued:

No, I want a cigarette. I want a cigarette. Then He did take off and go back to S.D. (inaudible) either. It's all partly true. The whole story is

9

partly true. I don't know. He came back beaten up from S.D. too. I didn't hit him in the head. (inaudible) when he fell on it. I stepped on it. That was after he threw it at me is how it ended up there. I'm not under arrest. I can go outside and have a cigarette if I want.

After a back and forth conversation between Susan and Ground, Susan stated, without being questioned:

> (inaudible) you'll arrest me because that's the way it always goes. Let's (inaudible) her and she's the one that always gets in trouble. (inaudible) self defense, self preservation. They made sure of it. It takes a heck of a hit for me to bruise but ... make sure that and Tom knew it.

Shortly thereafter, an unidentified female officer entered the room. Ground and the female officer took pictures of Susan's bruised hands and forearms. The interrogation video ends. Susan was subsequently arrested and charged with first degree murder and use of a deadly weapon to commit a felony.

## HEARING ON MOTION TO SUPPRESS INTERROGATION

On June 13, 2011, Susan filed a motion to suppress her statements given on March 12, which she argued were obtained in violation of her constitutional rights. Susan argued that there were three different statements made by her that invoked her constitutional right to end the interrogation. At 3:43 a.m., Susan stated, "I'm done, I wanna go to sleep. I'm tired." At 4 a.m., Susan stated, "I'm getting tired, I'm done, I'm tired." And the last relevant statement was made at 4:18 a.m., when Susan stated, "I want a lawyer, please. I'm tired of this."

10

At the hearing, the district court accepted a joint stipulation that Susan was in custody at the time of the interrogation.

In its order, the district court found Susan's first two statements were not unequivocal and unambiguous statements that she wanted to cut off the questioning. Additionally, the court found that all of the statements made by Susan after exercising her right to counsel were voluntarily made and were not the result of the functional equivalent of interrogation.

Susan filed a motion to reconsider. Upon reconsideration, the district court suppressed the statements made from 4 to 4:18 a.m., because her statement that she was "done" was unequivocal and unambiguous. However, statements made before 4 a.m. were admissible, because Susan had not yet invoked her right to end questioning. The district court found that statements made after 4:18 a.m. were admissible, because they were not the result of questioning or the functional equivalent.

RULE 404 HEARING

On January 26, 2012, the State filed an "Amended Motion to Conduct Hearing Pursuant to Neb.Rev.Stat. § 27–104 Regarding the Admissibility of § 27–404(2) Evidence." A hearing was held on the same date (rule 404 hearing), and evidence was accepted. There are three prior "bad acts" that the State wanted admitted for limited purposes.

For the first prior "bad act," the State offered the testimony of then-police officer Nicholas Schwalbe of Jackson, Minnesota. Schwalbe testified that on May 31, 2010, he received a call of a fight in progress at a truckstop. He identified the

driver as Tom and the passenger as Susan. Schwalbe observed that Tom had a black eye, a fresh wound under that eye, and scabbing on his face, ear, and neck, as well as spots of fresh blood rolling down his neck. Susan was placed under arrest. Susan told Schwalbe that they were fighting because Tom was cheating on her.

The second event occurred in August 2010. James Platt, Susan's son, and Sharon Platt, James' wife, testified that Susan and Tom unexpectedly came to live with them that August. Susan told them that she and Tom needed to get away from their home, which was in South Dakota at the time. Both James and Sharon testified that Tom was "in bad shape." Tom's face was beaten and swollen, and he had bloody ears. When asked, Susan told James that the injuries were caused by a truckstop robbery. James testified that Susan had for years believed Tom was unfaithful with someone from work. Shortly thereafter, James testified that Susan and Tom moved to Jefferson County, Nebraska.

The third event occurred in late 2010. James and Sharon visited Susan and Tom at their new home in Jefferson County. Both testified that Tom looked " 'terrible.' " He had cuts on his face and a split lip. Sharon asked Tom about his facial injuries, and Susan replied for Tom that the injuries happened at work when "the pigs got him."

At the hearing, the State also offered the testimony of McClure, Brian Bauer, and Ground. McClure testified about Susan's story that Tom had gone to South Dakota "probably up visiting his girlfriend." She testified about what Susan had told her at the hospital.

Bauer, who had employed Tom on his farm in Jefferson County, testified that Tom would come to work every 2 to 3 weeks visibly sore with bruises on his

face, black eyes, split lips, and marks on his hands. According to Bauer, these injuries did not occur at work.

Ground testified that at the hospital, Susan stated that Tom's facial injuries and split lip were caused by working on the farm. Susan told her that the split lip was caused by a pipe when Tom was working with a cow.

Based on the evidence presented, the district court found that the May 31, 2010, incident in Minnesota was admissible as it pertains to the injuries observed on Tom and to Susan's statement as to the reason for their altercation, for the specific and limited purposes of demonstrating the existence of motive and intent. The district court further ordered that all three incidents were admissible for the specific and limited purposes of negating, or demonstrating the existence of, intent, identity of the perpetrator, and absence of mistake or accident.

## TRIAL

A jury trial was held on February 21, 2012. The State offered the testimony of the 911 dispatcher, the responding emergency personnel, the investigating officers, Farber, Ground, McClure, Bauer, Schwalbe, and James and Sharon. The State offered the video interrogation of Susan at the police headquarters, with the footage from 4 to 4:18 a.m. redacted. The three prior bad acts that were the subject of the rule 404 hearing were also presented to the jury. In addition, the following evidence was presented.

EVIDENCE FOUND AT HOME

The DeJong home was searched on March 12, 2011. Tom's Chevrolet Blazer was parked in the detached garage. No evidence was found in the garage or either in or on the Blazer. Susan's white pickup truck was processed on March 15. Tom's blood was found on the hood and fender of the truck. Inside the pickup truck, there was a red duffelbag and a blue denim bag.

In the red bag, investigators found women's clothing, a yellow hammer, a blue hammer, toiletry items, men's pajamas, and Tom's wallet. The blue bag contained a computer, a lug wrench, and a cell phone.

DNA tests were conducted on this evidence, and results showed that the blue hammer had a mixture of Tom's and Susan's DNA. Susan's DNA was found on the handle of the yellow hammer, and a mixture of DNA was found in a blood sample on the claw area of the yellow hammer. Tom was the major contributor of that DNA. Tom's DNA was found in the bloodstains on the men's pajamas.

In the house, at least 70 blood drops were found throughout. No large pools of blood were found. Blood was found in the living room, kitchen, bathroom, dining room, and the master bedroom. Blood was also found on clothing items seized from the laundry room. A forensic scientist testified to which stains were left by Tom, by Susan, or by a mixture of the two. Tom's DNA was found repeatedly in the bloodstains through–out the house.

14

MEDICAL TESTIMONY

Dr. Craig Shumard was working in the emergency room when Tom was brought by ambulance to the Jefferson Community Health Center. Shumard described Tom's injuries to the jury and testified that the injuries did not arise from natural causes or accidents. He testified that Tom's injuries were inconsistent with typical farmwork injuries.

Dr. Stanley Okosun, a trauma surgeon at Bryan hospital, testified to his treatment and care of Tom. Okosun testified that Tom's high levels of myoglobin indicated that the trauma inflicted on Tom occurred 12 to 24 hours prior to his arrival at Bryan hospital. Okosun testified that Susan told him that Tom's bruising was caused by working on a pig farm. Okosun testified that the explanation was highly unlikely. He further testified that with the injuries suffered, Tom could not have driven home on the Friday morning before his death. According to Okosun, Tom's injuries could not have been caused by natural causes or a car accident. He attributed Tom's injuries to blunt force trauma caused by an assault.

Dr. Juris Purins was the radiologist who reviewed the CAT scan performed on Tom at Bryan hospital. The CAT scan revealed unusually severe head and brain injuries which are typically associated with a patient's not breathing. Tom's nose had a comminuted fracture, which means it was fractured in multiple places. Tom had a dislocation of the lens in his right eye, which was another unusual injury. Purins described a tremendous number of fractures within the chest cavity, including the spine, ribs, and scapula. One of the fractures was an old injury but the rest were recent. Purins also identified a fracture of the hyoid bone in the neck. Purins testified that the fractured hyoid bone, along with subcutaneous emphysema, indicated a potential choking injury. Purins opined that the injuries

15

were the result of a "pretty severe beating," maybe from a hammer, and that the injuries would have prevented Tom from driving or walking.

Dr. Jean Thomsen was the pathologist who performed Tom's autopsy. Thomsen stated that she had "never seen someone so extensively injured." After the autopsy, Thomsen found the cause of death to be "[b]lunt force trauma to the head, neck, chest and extremities." In her opinion, Tom's death was a homicide.

In her autopsy report, Thomsen found defects on Tom's hands and arms that she described as defensive wounds. Thomsen found that the injuries were caused by some type of instrument. Thomsen testified that the injuries were C-shaped and semicircular and may have been caused by a hammer. The autopsy also confirmed a fracture of the hyoid bone in the neck, but she did not find other signs usually associated with manual strangulation beyond neck bruising.

Defense counsel offered the expert testimony of Dr. Robert Bux, a forensic pathologist. Bux agrees that this case was a homicide caused by multiple instances of blunt force trauma. He stated that he has "never personally seen a case like this with so much soft tissue contusion." Tom was "really beaten." Bux opined that the injuries occurred at least 24 hours prior to death, and maybe as many as 36 hours prior. He agrees that the wounds on Tom's hands and arms indicate that Tom was attempting to ward off an attack.

Bux disagreed that a clawhammer was used, because there were no circle bruises from the hammerhead, no raking marks from the claw, and no pattern of contusions consistent with the side of a hammer. He opined that based on a lack of hemorrhaging around the hyoid bone, the bone had been fractured during the autopsy. He argued that the brain injuries were caused not by the blunt force

trauma but by Tom's not breathing while still at home. Bux also testified that Tom would have been able to walk and talk immediately after the beating he suffered, but that his condition would have continued to deteriorate. Bux also opined that because of the relatively small amounts of blood found in the home, the assaults that caused Tom's facial injuries likely did not occur in the home.

## INSTANT MESSENGER CHATS

An investigator seized Susan's computer and found relevant Internet instant messenger chats. James, Susan's son, confirmed the messages were sent to him from Susan under her handle "the_piglady." On September 24, 2010, the "the_ piglady" wrote in reference to Tom, "i can't do this ... staying here anymore," "i've come to realize i literally hate him." She continued, "now i wish he was dead ... i really hate him more than i have ever hated ANYONE." On February 14, "the_piglady" wrote that "i'm looking at getting rid of tom" and "i can't take or do this anymore."

## TOM'S WHEREABOUTS WEEK OF HIS DEATH

Beyond testifying about Tom's injuries while working at the farm, Bauer testified that on the Tuesday before his death, Tom worked a full day. Tom was bruised and had trouble getting around. On Wednesday and Thursday, Tom called in sick. On Thursday, Bauer drove by the house and noticed that both vehicles owned by the DeJongs were at the house, including Tom's Blazer.

James testified that he had a telephone conversation with Susan on the Thursday morning before Tom's death. James asked Susan what size tires were on Susan's white pickup truck. James testified that Susan asked someone else in the

house. James assumed that the person was Tom and was surprised that Tom was not working. James testified that Susan did not mention in that telephone call that Tom was in South Dakota.

Cell phone records were also introduced into evidence. On March 8, 2011, the Tuesday before Tom's death, there were four calls from Susan's cell phone to Tom's cell phone and the calls "hit" or "pinged" off the nearby cell towers in the Fairbury and Hebron, Nebraska, areas. On Wednesday and Thursday, there were calls from Tom's cell phone to Bauer's cell phone. Both calls "hit" off cell towers in the Fairbury and Hebron areas.

## ALLEGED MISTRESS

The woman who Susan alleged was Tom's mistress also testified at trial. The woman worked as a dispatcher for a small trucking company in South Dakota. Tom had been a truckdriver for that company. The woman testified that she and Tom had a working relationship only. She never spent time with Tom socially. She never had any type of sexual contact with Tom. She testified that she had no reason to want to hurt Tom or Susan. The woman testified that from March 8 to 11, 2011, she was on a trip to Minnesota and had no contact with Tom. She testified that she did not inflict Tom's injuries.

## CONVICTIONS AND SENTENCES

After deliberation, the jury found Susan guilty on count I, murder in the first degree, and guilty on count II, use of a deadly weapon to commit a felony. Susan was sentenced to life imprisonment for count I and 50 to 50 years' imprisonment on count II, to be served consecutively.

18

## B.    Direct Appeal

DeJong appealed her convictions and sentences to the Nebraska Supreme Court. (Filing No. 17-1.) She alleged on direct appeal that the trial court erred by (1) admitting at trial the statements she made to investigators between 3:43 to 4 a.m.; (2) admitting at trial the statements she made to investigators after 4:18 a.m.; (3) admitting at trial evidence of Tom's injuries on prior occasions and her related statements concerning the injuries; and (4) admitting at trial evidence of Tom's injuries on prior occasions and her related statements concerning the injuries, because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. (Filing No. 17-4 at CM/ECF p. 7; Filing No. 17-7 at CM/ECF pp. 8-9.) DeJong was represented both at trial and on direct appeal by lawyers from the same office. (*See* Filing No. 17-1; Filing No. 18-1 at CM/ECF p. 2.)

The Nebraska Supreme Court affirmed DeJong's convictions and sentences in a written opinion. *See DeJong*, 845 N.W.2d at 883.

## C.    Postconviction Action

DeJong filed a motion for postconviction relief in state district court. (Filing No. 17-16 at CM/ECF pp. 2-16.) DeJong argued that (1) she received ineffective assistance of counsel because counsel failed to "investigate further" and question more extensively numerous witnesses who testified at trial and failed to argue on direct appeal that there was insufficient evidence to support her convictions and sentences; (2) the state district court erred when it admitted evidence related to prior bad acts and other evidence; and (3) she is actually innocent. (*Id.*; Filing No.

17-5 at CM/ECF p. 13.) The state district court denied postconviction relief without holding an evidentiary hearing. (Filing No. 17-16 at CM/ECF pp. 21-23.)

DeJong filed two separate notices of appeal from the same postconviction judgment, which resulted in the docketing of two separate state appellate cases. (Filing No. 17-2; Filing No. 17-3.) The Nebraska Supreme Court dismissed the first appellate case when DeJong failed to file a brief. (Filing No. 17-3 at CM/ECF p. 2.) In the other appellate case, the Nebraska Supreme Court affirmed the state district court's denial of postconviction relief in a written opinion. *See State v. DeJong*, 872 N.W.2d 275 (Neb. 2015).

## D.    Habeas Corpus Action

DeJong filed her habeas petition and an amended petition. (Filing No. 1; Filing No. 13.) Respondents[1] filed an answer, brief, and the relevant state court records in response to the habeas petition and amended petition. (Filing Nos. 17, 18, 19, 23, 24.) DeJong filed a brief in support of her petitions. (Filing No. 31.) Respondents notified the court that they would not be filing a reply brief. (Filing No. 33.) This matter is fully submitted for disposition.

---

[1] Assistant Attorney General Erin E. Tangeman entered her appearance on behalf of Respondent State of Nebraska. (*See* Filing No. 1; Filing No. 12.) Thereafter, DeJong filed her amended petition and added Respondents Warden Denise Skrobecki, Director Scott R. Frakes, and the Nebraska Correctional Center for Women. (Filing No. 13.) The court will assume that Ms. Tangeman represents all Respondents in this matter as she responded to DeJong's amended petition in her answer and brief. (Filing No. 23; Filing No. 24.) In any event, the court's reasoning does not differ amongst Respondents.

## II.  STANDARDS OF REVIEW

### A.    Exhaustion Requirement

As set forth in 28 U.S.C. § 2254:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

    (A)    the applicant has exhausted the remedies available in the courts of the State; or

    (B)    (i)    there is an absence of available State corrective process; or

        (ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented in an appeal to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005). "In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation marks omitted).

A state prisoner must therefore "fairly present" the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented in an appeal to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454–55 (8th Cir. 2005).

Moreover, where "no state court remedy is available for the unexhausted claim - that is, if resort to the state courts would be futile - then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S.

152, 162 (1996)). Stated another way, if a claim has not been presented to the Nebraska appellate courts and is now barred from presentation, the claim is procedurally defaulted, not unexhausted. *Akins*, 410 F.3d at 456 n.1.

Under Nebraska law, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). In such circumstances, where a Nebraska state court rejects a claim on state procedural grounds, and issues a "'plain statement' that it is rejecting petitioner's federal claim on state procedural grounds," a federal habeas court is precluded from "reaching the merits of the claim." *Shaddy v. Clarke*, 890 F.2d 1016, 1018 (8th Cir. 1989). However, the state court procedural decision must "rest [ ] on independent and adequate state procedural grounds." *Barnett v. Roper*, 541 F.3d 804, 808 (8th Cir. 2008) (quotation omitted). "A state procedural rule is adequate only if it is a firmly established and regularly followed state practice." *Id.* (quotation marks omitted).

## B.   Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A

state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, Section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id*. However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

24

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance–combined with its express determination that the ineffective-assistance claim as a whole lacked merit–plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

## III. DISCUSSION

### A.   Claim One

DeJong asserts that her conviction was obtained by a violation of the privilege against self-incrimination. (*See* Filing No. 1 at CM/ECF p. 5.) The Nebraska Supreme Court considered and rejected this argument in DeJong's direct appeal. The court agreed with DeJong that her statements from 3:43 to 4 a.m. should have been suppressed because the interrogation continued after she invoked her right to remain silent, but concluded that the error was harmless. *DeJong*, 845 N.W.2d at 873-74. The court determined that the error was harmless because (1) the untainted, relevant evidence strongly supported DeJong's guilt, and (2) DeJong's statements were cumulative and "very minor" relative to the rest of the untainted record. *Id.* at 875-77. The court concluded that "there is no reason to

25

believe that Susan's statements from 3:43 to 4 a.m. materially influenced the jury's verdicts." *Id.* at 877.

The admission of a coerced confession is a trial error subject to the same harmless error analysis as other erroneous admissions of evidence. *Simmons v. O'Brien*, 77 F.3d 1093, 1095 (8th Cir. 1996) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (erroneous admission of an involuntary confession does not require reversal if, on review of the evidence as a whole, the error was harmless beyond a reasonable doubt). The applicable harmless error analysis in a habeas proceeding is whether the state trial error had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)); *See also Jackson v. Norris*, 573 F.3d 856, 858 (8th Cir. 2009).

In this case, the majority of DeJong's statements from 3:43 to 4 a.m. were cumulative to her properly admitted statements made to Ground at the hospital prior to her interrogation. Moreover, the untainted, relevant evidence against DeJong was overwhelming. The evidence established (1) that DeJong lied about Tom's whereabouts before the murder, (2) that DeJong's story that Tom was beaten by his alleged mistress was fabricated, (3) that DeJong's motive for killing Tom was because she believed he had a mistress, (4) that DeJong sent Internet instant messages in which she stated that she "hate[d]" Tom, wished he were dead, and that she was "looking at getting rid" of him, (5) that no one other than DeJong spent time with Tom after he sustained his injuries, (6) that Tom's injuries were caused by some type of instrument, possibly a hammer, (7) that DeJong had bruises and sores on her palms consistent with swinging a hammer, (8) that a bloodstained hammer recovered in DeJong's truck had a mixture of her and Tom's DNA; her DNA was found on the handle and his DNA was found on the head of

the hammer; and (9) that DeJong had assaulted Tom on multiple occasions prior to his death. *See DeJong*, 845 N.W.2d at 875-77. Based on these circumstances, the admission of DeJong's statements from 3:43 to 4 a.m. did not have a "substantial and injurious effect or influence" on the jury's verdict. DeJong is entitled to no relief on Claim One.

## B.   Claims Two and Four

DeJong asserts that she was denied access to an attorney during interrogation. (*See* Filing No. 1 at CM/ECF p. 5.) She also asserts that she was coerced into a confession. (*Id.* at CM/ECF p. 7.) The Nebraska Supreme Court necessarily considered and rejected these assertions on direct appeal. The Nebraska Supreme Court considered whether DeJong's statements made after 4:18 a.m. should be suppressed because she invoked her right to counsel. *See DeJong*, 845 N.W.2d at 877. The court determined that DeJong's statements after 4:18 a.m. were voluntary because she clearly initiated the conversation with Ground and there was no interrogation after she initiated it. *Id.* at 877-78.

The Nebraska Supreme Court disagreed with DeJong that "she was compelled to talk because 'the cat was already out of the bag' due to her previous inadmissible statements." *Id.* at 878. The court reasoned:

> The U.S. Supreme Court has stated that "after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good." But the fact that the defendant has shared a secret in an inadmissible statement does not preclude the defendant from later waiving his or her constitutional rights after the conditions that induced the original statement have

been removed. The U.S. Supreme Court has explicitly rejected any "rigid rule" that suppresses the subsequent statement and has instead directed courts to focus on the voluntariness of any subsequent statement. To do so, a court must evaluate the "entire course of police conduct" and the surrounding circumstances, including whether or not the conditions that made the first statement inadmissible had been removed.

In *Missouri v. Seibert*, the surrounding conditions made the subsequent statement inadmissible. In that case, the police purposefully did not give the suspect a warning of his rights to silence or counsel until the inadmissible interrogation had produced a confession. Subsequent to the confession, the officer then gave the suspect his *Miranda* rights and then reinterrogated him until he confessed again. The U.S. Supreme Court held that the subsequent confession repeated after the *Miranda* warnings were given was inadmissible. The plurality opinion reasoned that "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." The plurality surmised that the suspect would be perplexed as to why his or her rights were being discussed at that point. Further, telling the suspect that what he or she says will be used against them creates an inference that the prior statements made by the suspect will be used against them. Thus, the actions of the officer are "likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" In such a situation, the unwarned and warned interrogations blended into one "continuum."

But in Justice Kennedy's concurring opinion to *Seibert*, he reiterated that subsequent statements can be admissible if the "continuum" was broken by

[c]urative measures ... designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn.

And in *Bobby v. Dixon*, the Court accordingly held that the "continuum" between two of the interrogations had been broken and that therefore, the subsequent confession was admissible. Archie Dixon was arrested for forgery and was interrogated without receiving *Miranda* warnings. During this unwarned interrogation, Dixon readily admitted to obtaining an identification card from a murder victim and forging checks with the murder victim's signature. Dixon was booked for forgery and sent to a correctional facility.

Four hours later, Dixon was transported back to the police station. Prior to any police questioning, Dixon told the police, "'I talked to my attorney, and I want to tell you what happened.'" The police read Dixon his *Miranda* rights, and Dixon signed a waiver. The interrogation began, and Dixon admitted to the murder but attempted to pin the blame on his accomplice.

The U.S. Supreme Court held that the admission of Dixon's murder confession was consistent with its precedent. The Court noted that this was not the sort of two-step interrogation procedure condemned in *Seibert*. It found that given all the circumstances, Dixon had a real choice about giving an admissible statement. Four hours had passed between Dixon's unwarned interrogation and the receipt of his *Miranda* rights, he claimed to have spoken to his lawyer, and he had learned that the police had additional physical evidence. As the Court stated, "this significant break in time and dramatic change in

circumstances created 'a new and distinct experience,' ensuring that Dixon's prior, unwarned interrogation did not undermine the effectiveness of the *Miranda* warnings he received before confessing to [the victim's] murder."

The U.S. Supreme Court reinstated the opinion of the Ohio Supreme Court and noted that its holding did not excuse the officer's decision to not give *Miranda* warnings before the first interrogation. But, the Court observed, the Ohio courts had already properly recognized the officer's failure and had remedied it by excluding Dixon's forgery confession and the attendant statements.

Here, we find that the circumstances in the interrogation room had changed dramatically after Susan's third invocation and that the change gave Susan a real opportunity to make a voluntary statement. In coming to our holding, we evaluated the entire course of police conduct and the surrounding circumstances. This was not a two-step interrogation technique as in *Seibert*. Susan was made fully aware of her rights before any statements were made. However, the police did ignore Susan's first two invocations and Farber continued to question Susan for an additional 35 minutes. During those 35 minutes, the interrogation did become more intense and Susan did make incriminating statements. Only when Susan requested an attorney did the interrogation stop and Farber and Ground left the room.

We have established that Farber had previously violated Susan's right to cut off questioning, and we do not excuse his conduct. But such conduct resulted in the district court's suppressing Susan's interrogation statements from 4 to 4:18 a.m. Although the district court did not suppress Susan's statements from 3:43 a.m., we have found that the admission of those statements was harmless. As in *Dixon*, the prior *Miranda* violations have been remedied.

The prior *Miranda* violations do not warrant suppression of Susan's statements made after 4:18 a.m. The circumstances of the

30

entire situation indicate that the effectiveness of the *Miranda* warnings given to Susan was restored when Farber and Ground ended the interrogation upon Susan's request for an attorney. The actions of the investigators reasonably demonstrated to Susan that she had properly invoked her right to an attorney and that the interrogation was over. Susan faced " 'a new and distinct experience.'" After her two prior invocations, the questioning did not even momentarily stop. In both instances, the questioning continued and Susan, without further verbal resistance, continued to answer. Contrary to those experiences, Susan faced a new experience after her invocation for an attorney. She was no longer subject to modern interrogation techniques. The investigators stood and left the room, indicating a clear intention to end the interrogation. Susan was left alone.

And unlike in *Elstad* and *Seibert*, Susan initiated the second conversation. She was never again subjected to questioning. Susan made the decision to reinitiate the dialog with the investigators, and she was not explicitly attempting to clarify or explain her previous inadmissible statements. Susan, for whatever reason, wanted to tell more of her story. As the *Edwards* Court noted:

> It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision. As Justice White has observed, this Court consistently has "rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case."

Therefore, we affirm the district court's determination that Susan's prior statements, which were made after she invoked her right to end questioning, did not render inadmissible her statements made

31

after her interrogation ended. We find that Susan's statements after 4:18 a.m. were initiated by Susan and were not the product of interrogation. Although the cat may have been, in some limited respects, out of the bag, the fact that the interrogation ended and the officers left the room had significantly changed the circumstances of the interrogation process and gave Susan a "real choice about giving an admissible statement." Susan's statements after 4:18 a.m. were voluntary.

*Id*. at 878–81 (internal citations omitted).

The court agrees with the analysis of the Nebraska Supreme Court. But more importantly, DeJong has not shown that the Nebraska Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or that the court reached "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). DeJong is entitled to no relief on Claims Two and Four.

## C.    Claims Three and Five

DeJong asserts that she was unlawfully detained by investigators. (*See* Filing No. 1 at CM/ECF pp. 5, 16.) She also challenges the sufficiency of the evidence. (*See id*. at CM/ECF pp. 17-19.) DeJong did not raise these arguments on direct appeal.[2] Because they could have been litigated on direct appeal, Claims Three and Five are procedurally defaulted. *See Hall v. State*, *supra*.

---

[2] Nevertheless, as the Nebraska Supreme Court noted in its postconviction appeal opinion, it necessarily considered the sufficiency of the evidence in its

**D.      Claim Six**

DeJong asserts that she is innocent. (*See* Filing No. 1 at CM/ECF pp. 17-19.)
The Nebraska Supreme Court rejected this claim in DeJong's postconviction
appeal:

> We have previously acknowledged the possibility that a
> postconviction motion asserting a persuasive claim of actual
> innocence might allege a constitutional violation, in that such a claim
> could arguably amount to a violation of a movant's procedural or
> substantive due process rights. *State v. Phelps*, 286 Neb. 89, 834
> N.W.2d 786 (2013). However, in order to trigger a court's
> consideration of whether continued incarceration could give rise to a
> constitutional claim that can be raised in a postconviction motion,
> there must be "'[a] strong demonstration of actual innocence'"
> "'because after a fair trial and conviction, a defendant's presumption
> of innocence disappears.'" *Id*. at 94, 834 N.W.2d at 791, quoting *State
> v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012). Indeed, the U.S.
> Supreme Court has held that the threshold is "'extraordinarily high.'"
> *Id*. at 94, 834 N.W.2d at 791–92, quoting *Herrera v. Collins*, 506 U.S.
> 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).
>
> In support of her claim that she is actually innocent, Susan relies
> heavily on the assertion that there were no direct witnesses to Tom's
> murder. She states that "[n]o one ever witnessed anything, verbally or
> physically, to prove absolutely without a doubt" that she murdered
> Tom. Brief for appellant at 6. Susan also argues that there was
> insufficient DNA or other physical evidence found in various
> locations, including the DeJong home, to link her to Tom's murder.

---

analysis of DeJong's asserted errors on direct appeal. *See DeJong*, 872 N.W.2d at
289.

Although there were no direct witnesses to Tom's murder, when viewed in the light of the extensive evidence adduced at trial as summarized in our opinion on direct appeal and quoted above, Susan's allegations fall well short of the "extraordinarily high" threshold showing of actual innocence which she would be required to make before a court could consider whether her continued incarceration would give rise to a constitutional claim. Susan did not allege facts sufficient to necessitate an evidentiary hearing. Therefore, we determine that the district court did not err when it denied relief without an evidentiary hearing on this claim. We affirm this portion of the district court's order.

*DeJong*, 872 N.W.2d at 292.

With respect to the standard for freestanding actual innocence claims, the Eighth Circuit has similarly concluded:

The Supreme Court has not decided whether a persuasive demonstration of actual innocence after trial would render unconstitutional a conviction and sentence that is otherwise free of constitutional error. *See House v. Bell*, 547 U.S. 518, 554–55, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The Court has established, however, that the threshold for any such claim, if it were recognized, would be "extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). The threshold, if it exists, would require "more convincing proof" than the "gateway" standard that allows for consideration of otherwise defaulted constitutional claims upon a showing of actual innocence. *House*, 547 U.S. at 555, 126 S.Ct. 2064; *see Schlup v. Delo*, 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Thus, on a freestanding claim of actual innocence, it is not sufficient that a petitioner shows even that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 115

S.Ct. 851. The "extraordinarily high" threshold, if recognized, would be even higher. *House*, 547 U.S. at 555, 126 S.Ct. 2064.

*Dansby v. Hobbs*, 766 F.3d 809, 816 (8th Cir. 2014). DeJong has proffered no new evidence establishing her factual innocence. "The actual innocence exception is concerned with claims of actual, not legal, innocence." *Pitts v. Norris*, 85 F.3d 348, 350 (8th Cir. 1996). To be clear, for the same reason, DeJong's claim of actual innocence does not excuse her procedurally defaulted claims. *See generally Flanders v. Graves*, 299 F.3d 974, 977 (8th Cir. 2002) ("a petitioner who can show actual innocence can get his constitutional claims considered on their merits even if he cannot show cause and prejudice") (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). DeJong is entitled to no relief on Claim Six.

## E.      Claim Seven

In her amended petition, DeJong asserts that she was denied effective assistance of counsel when counsel (a) failed to make various arguments at trial, (b) did not allow her to participate during trial and in jury selection, and (c) failed to assert the claims in her habeas petition on direct appeal. (Filing No. 13.) Because she had the same counsel at trial and on direct appeal, DeJong's first opportunity to bring these claims was on postconviction. *See State v. Robinson*, 827 N.W.2d 292, 302 (Neb. 2013) ("when a defendant was represented both at trial and on direct appeal by the same lawyer, the defendant's first opportunity to assert ineffective assistance of counsel is in a motion for postconviction relief.").

The two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984) governs the merits of an ineffective assistance of counsel claim. *Strickland* requires that a petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The

first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Knowles v. Mirzyance*, 556 U.S. 111, 121-123 (2009). In the habeas context, there is doubly deferential standard of review because *Strickland* is a general standard, and habeas review by the very nature of the remedy requires deference to the separate sovereign's decision. *Id.*

In her postconviction appeal, the Nebraska Supreme Court rejected DeJong's claim that counsel failed to argue on direct appeal that the evidence was insufficient to support her convictions. The court found that it necessarily considered the sufficiency of the evidence in its analysis of the errors asserted on direct appeal. *DeJong*, 872 N.W.2d at 289. It then set forth the extensive evidence introduced at trial, as stated in its direct appeal opinion, which established DeJong's guilt. *Id.* at 289-90. The court concluded:

> We have reviewed the record in this case, and given the extensive evidence presented at trial against Susan, we determine that the records and files in this case affirmatively show that Susan was entitled to no relief on her claim that there was insufficient evidence to support her convictions and that counsel's appellate argument failed to present the issue for our consideration. In connection with this contention, Susan has failed to suggest any facts which, if proved, constitute an infringement on her constitutional rights. The record shows that Susan was not prejudiced by counsel's conduct on direct

36

appeal, and therefore, the district court did not err when it denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

*Id*. at 290–91. Because counsel presented the sufficiency of the evidence issue for the Nebraska Supreme Court's consideration, DeJong's claim that counsel failed to raise Claim Five is without merit. Similarly, the Nebraska Supreme Court considered and rejected Claims One, Two, Four, and Six, so DeJong's claim that counsel failed to raise those claims are without merit.

To the extent that DeJong raised the remaining allegations of her amended petition in her postconviction motion, the Nebraska Supreme Court equally rejected them in her postconviction appeal when it held:

> Susan argues on appeal that certain evidence should not have been admitted at trial, such as items located during searches, including the search of the vehicle and home. She also makes allegations in her postconviction motion regarding other evidence she asserts is objectionable, but, other than listing a catalog of constitutional provisions, she does not necessarily direct our attention to specific constitutional errors regarding these claims on appeal. Her allegations of conclusions do not require an evidentiary hearing. *See State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015). We have reviewed her motion and have determined that her claims either are speculative and fail to affirmatively show that she is entitled to relief or are refuted by the record and files in this case. *See id*. Accordingly, we determine that Susan did not allege facts sufficient to necessitate an evidentiary hearing, and the district court did not err when it denied postconviction relief without an evidentiary hearing.

> [. . .]

37

> We find no merit to Susan's assignments of error. Therefore, we determine that the district court did not err when it denied her motion for postconviction relief without an evidentiary hearing.

*Id*. at 292–93. DeJong is entitled to no relief on Claim Seven. Accordingly, to the extent that DeJong attempts to show "cause" and "prejudice" by attacking her appellate counsel in order to excuse procedural default of her claims, she has failed.

## IV.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he or she is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A certificate of appealability cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. Daniel*, 529 U.S. 473, 484 (2000).

In this case, DeJong has failed to make a substantial showing of the denial of a constitutional right. The court is not persuaded that the issues raised in DeJong's petitions are debatable among reasonable jurists, that a court could resolve the issues differently, or that the issues deserve further proceedings.  Accordingly, the court will not issue a certificate of appealability in this case.

IT IS THEREFORE ORDERED that:

1.      The Petition for Writ of Habeas Corpus and amended petition (Filing No. 1; Filing No. 13) are dismissed with prejudice.

2.      The court will enter a separate judgment in accordance with this Memorandum and Order.

3.      The court will not issue a certificate of appealability.

Dated this 9th day of February, 2017.

                                        BY THE COURT:

                                        s/ *Richard G. Kopf*
                                        Senior United States District Judge